UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X
                                                          :
ANTONIO GIANCOTTI,                                        :
                                                          :
                              Plaintiff,                  :
                                                          :           23 Civ. 3457 (JPC)
              -v-                                         :
                                                          :           OPINION AND ORDER
PIZZAROTTI LLC, *et al.*,                                 :
                                                          :
                              Defendants.                 :
                                                          :
--------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Antonio Giancotti has sued Pizzarotti LLC, Ignazio Campoccia, and Michael Butta for

violating various provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*,

and the New York Labor Law ("NYLL").  He claims that Defendants failed to pay him overtime,

failed to provide him with the required wage notice and wage statements, failed to pay him on

time, unlawfully deducted from his wages, and then retaliated against him for complaining about

these labor-law violations.

      Defendants now move for summary judgment on all of Giancotti's claims.  For the reasons

that follow, the Court grants Defendants' motion in part and denies it in part.  Specifically,

summary judgment is granted on Giancotti's claims pertaining to the NYLL's wage-notice

requirement and wage-statement requirement, which are dismissed without prejudice, and is

denied for all other claims.

# I.  Background

## A.    Facts[1]

Giancotti, who hails from Italy and speaks Italian as his first language, began working at

Pizzarotti, a construction company part of an Italian construction conglomerate, in October 2017.

Defts. 56.1 Stmt. ¶¶ 1, 61, 63.  He started with the company as a laborer, getting paid $25 an hour

---

[1] The facts throughout this Opinion and Order are drawn from Defendants' statement of undisputed material facts under Local Civil Rule 56.1(a), Dkt. 46-1 ("Defts. 56.1 Stmt."), Giancotti's counterstatement under Local Civil Rule 56.1(b), Dkt. 48 ("Pl. 56.1 Counter Stmt."), and the exhibits filed by the parties.  Unless otherwise noted, the Court cites only to Defendants' statement of undisputed material facts when Giancotti does not dispute the fact, has not offered admissible evidence to refute it, adds his own "spin" on the fact, or otherwise disputes the inferences drawn from it.

Among the exhibits filed by the parties were transcripts of several depositions conducted during discovery.  Those deposition transcripts are referred to as follows: (1) Dkt. 47 ("Ho Decl."), Exh. 1, and Dkt. 49 ("Kafedjian Decl."), Exh. A, collectively as "Giancotti Dep. Tr."; (2) Ho Decl., Exh. 2, and Kafedjian Decl., Exh. B, collectively as "Butta Dep. Tr."; (3) Ho Decl., Exh. 3, and Kafedjian Decl., Exh. C, collectively as "Campoccia 5/16 Dep. Tr."; (4) Ho Decl., Exh. 4, and Kafedjian Decl., Exh. D, collectively as "Riaz Dep. Tr."; (5) Ho Decl., Exh. 5, and Kafedjian Decl., Exh. E, collectively as "Campoccia 5/13 Dep. Tr."; (6) Ho Decl., Exh. 6, and Kafedjian Decl., Exh. F, collectively as "Vinci Dep. Tr."; (7) Ho Decl., Exh. 7, and Kafedjian Decl., Exh. G, collectively as "Sciacca Dep. Tr."; and (8) Ho Decl., Exh. 8, and Kafedjian Decl., Exh. H, collectively as "Lee Dep. Tr."

In their reply brief, Defendants ask the Court to "reject Plaintiff's Statement of Facts" as overlong and thus inconsistent with Local Civil Rule 56.1.  Dkt. 55 ("Defts. SJ Reply") at 5-6.  But Defendants never moved to strike Giancotti's counterstatement of facts, *see* Fed. R. Civ. P. 7(b), nor, in any event, would the Court be inclined to strike the thirty-page counterstatement to a twenty-two-page statement as overlong.  *Cf. Wells Fargo Bank, N.A. v. U.S. Life Ins. Co.*, No. 22 Civ. 8606 (JPC), 2025 WL 2220948, at *1 n.1 (S.D.N.Y. Aug. 4, 2025) (concluding that a 143-page counterstatement to an eleven-page Rule 56.1 statement "went beyond the proper scope authorized in Local Rule 56.1(b)").

Defendants also ask this Court to "reject any testimony in Plaintiff's Declaration that contradicts his deposition" under the sham affidavit rule.  Defts. SJ Reply at 6.  The Court is not convinced that the rule applies, as the Second Circuit "has declined to disregard an affidavit as a sham in cases where there is a readily apparent, plausible explanation for the inconsistency or where the deposition is only arguably contradictory to the affidavit."  *Brandon v. Kinter*, 938 F.3d 21, 33 n.9 (2d Cir. 2019) (internal quotation marks and citations omitted).  That is the case here, although in this Opinion the Court notes where, if anywhere, evidence is plainly contradicted by a party's assertion.  *See infra* n.4.

and overtime until May 2021. *Id.* ¶ 63; Kafedjian Decl., Exh. Z at PZ000335. At that time, Giancotti was working as an hourly paid laborer on a private construction project on West 14th Street in New York City (the "14th Street Project"). Defts. 56.1 Stmt. ¶¶ 17, 140; Kafedjian Decl., Exh. Z at PZ000335.

At the 14th Street Project, Giancotti reported to Campoccia, Pizzarotti's Chief Operating Officer ("COO") who also served as the jobsite's project executive. Kafedjian Decl., Exh. Z at PZ000335; Campoccia 5/13 Dep. Tr. at 131:1-18. As a project site executive, Campoccia had input into the hiring of worksite laborers and supervisors like a superintendent or assistant superintendent. Vinci Dep. Tr. at 15:14-16:7; Riaz Dep. Tr. at 27:13-28:19. (Some evidence suggests that Campoccia also had input into approving Giancotti's initial hiring in 2017, even if he met Giancotti only after Giancotti was hired. Vinci Dep. Tr. at 22:21-25:14; Defts. 56.1 Stmt. ¶ 46.) In that capacity, Campoccia had the authority to sign an employee's position and rate change document. Lee Dep. Tr. at 38:9-24.

In May 2021, Giancotti's job title and pay changed from a laborer making $25 an hour to an "Assistant Superintendent" making $104,000 a year. Defts. 56.1 Stmt. ¶¶ 68, 72-73. The parties strongly dispute how and why those changes happened. According to Defendants, Giancotti's putative promotion was decided "by Human Resources and the Chief Executive Officer [('CEO')]" without the involvement of Campoccia or Butta, Pizzarotti's Cost Control Manager. *Id.* ¶¶ 23, 31-32, 52, 71, 177. Campoccia and Butta later met with Giancotti only "to explain" what Human Resources and the CEO "already had decided," namely Giancotti's "new position" and new salary. Campoccia 5/13 Dep. Tr. at 53:4-16. In their briefing, Defendants characterize the reasons for Giancotti's promotion as replacing recently departed assistant superintendents and "to help Plaintiff" with his "poor financial situation." Dkt. 46-2 ("Defts. SJ

Br.") at 1; *see* Kafedjian Decl., Exh. N at Giancotti000160; Vinci Dep. Tr. at 28:17-31:19.

For his part, Giancotti states that in early May 2021, he was transferred by Campoccia from the 14th Street Project to a jobsite on Amsterdam Avenue (the "Amsterdam Project") in order to operate the Bobcat forklift there.  Dkt. 50 ("Giancotti Decl.") ¶ 5.  Once at the Amsterdam Project, Giancotti says, he learned that he should be making the forklift operator's prevailing wage,[2] which was much higher than $25 an hour.  *Id.* ¶ 6; Giancotti Dep. Tr. at 84:13-85:22.  So Giancotti approached Campoccia and Butta to complain about his pay.  Giancotti Decl. ¶ 7; Giancotti Dep. Tr. at 86:3-88:7.  (It is undisputed that Butta "was present" when Giancotti "asked Mr. Campoccia for a pay raise."  Defts. 56.1 Stmt. ¶ 32.)  Those approaches were successful, as Butta sent Pizzarotti's human resources manager an email that "Ignazio [Campoccia] agreed [to] a weekly pay of $2000 per week with Antonio Giancotti" and asked the manager to "prepare the new contract."  Kafedjian Decl., Exh. I at PZ005164-005165.  According to Butta, "Ignazio [Campoccia]" "thought that" Giancotti was "capable" of covering the assistant superintendent position.  Butta Dep. Tr. at 87:7-88:11.  And Alfredo Vinci, Pizzarotti's CEO, acknowledged that he was "aware" but not "really involved" with the promotion, whose paperwork was signed by both Campoccia and the human resources manager on May 14, 2021.  Vinci Dep. Tr. at 29:15-30:6; Kafedjian Decl., Exh. Z at PZ000335.

With the changes in Giancotti's title and pay came certain undisputed perks.  Giancotti was assigned a Pizzarotti email account and received a phone reimbursement.  Defts. 56.1 Stmt. ¶¶ 76-77.  His vacation time increased by a week, and he was afforded paid sick leave.  *Id.* ¶¶ 77, 126.  (While most general laborers were not given health insurance and other similar benefits, Giancotti

---

[2] The Amsterdam Project was a prevailing-wage project because it was publicly funded by the New York City Housing Authority.  Defts. 56.1 Stmt. ¶¶ 9, 84.

was provided health insurance even before his promotion.  *Id.* ¶ 4; Giancotti Dep. Tr. at 77:20-78:16.)  And he was told by the human resources manager that he would no longer need to punch in and out like the other laborers, and he would log eight hours per day.  Defts. 56.1 Stmt. ¶ 78; Ho Decl., Exh. 15 at PZ004843.  But as Giancotti's "promotion include[d] 1 hour of overtime per day and working on Saturdays," Kafedjian Decl., Exh. Z at PZ000335, Giancotti maintains that he "was expected to work 53 hours a week," Pl. 56.1 Counter Stmt. ¶ 10(a).

The extent of Giancotti's responsibilities as assistant superintendent, however, is heavily disputed.  At the Amsterdam Project, per Defendants, Giancotti almost exclusively assisted the superintendent, Muhammed Riaz; managed construction-related activities; and verified that the laborers did their work correctly.  Defts. 56.1 Stmt. ¶¶ 10, 79.  In particular, Giancotti would relay Riaz's instructions to the laborers, check on the laborers to see whether they were doing their jobs, and take pictures of alleged damage complaints and the workers alike.  *Id.* ¶¶ 92, 94, 96, 100, 103. He also signed certified payroll records and the laborers' time sheets.  *Id.* ¶¶ 81, 84-88.  Giancotti further participated in meetings with Pizzarotti managers after the laborers left for the day to recap the day's work and plan for the next day.  *Id.* ¶¶ 109, 137.  And on one occasion, Giancotti purported to "fire[]" two laborers for being "irresponsible."  Ho Decl., Exh. 18 at PZ000890.

Giancotti, on the other hand, asserts that his primary responsibility at the Amsterdam Project was manual labor.  According to Giancotti, Campoccia "would direct" him on "a day-to-day basis to do things like operate the bobcat, clean up a worksite, move materials, move office furniture, and perform other construction tasks."  Giancotti Decl. ¶ 35; *see id.* ¶ 16 ("At the Amsterdam site, I was primarily required to operate the bobcat to unload and move materials to the staging area and to clean up garbage and debris from the worksite.  I operated the bobcat approximately six hours per day, five days per week."); Dkt. 51 ("Gabriele Decl.") ¶ 4 (recalling

that she would see Giancotti "operating the bobcat for the vast majority of the workday," "moving materials around the project worksite[,] and moving [the debris] into the dumpsters with the bobcat")[3]; Pl. 56.1 Counter Stmt. ¶ 10(b). Such manual tasks, Giancotti claims, took up "at least 90%" of his workday. Giancotti Decl. ¶ 15; Pl. 56.1 Counter Stmt. ¶ 10(a). Defendants acknowledge that Campoccia "would ask [Giancotti] for help" with such tasks like cleaning at least "[o]ccasionally." Defts. 56.1 Stmt. ¶ 55. Giancotti contends that other responsibilities like translating supervisors' instructions to the laborers, taking daily attendance reports, and photographing the worksite covered the remaining ten percent of his workday. Pl. 56.1 Counter Stmt. ¶ 10(e); Giancotti Decl. ¶¶ 22, 25. He also maintains that he would "keep an eye on the other laborers to make sure they did their jobs" only when he was not driving the Bobcat. Giancotti Dep. Tr. at 171:2-23. While Giancotti concedes that he signed and submitted the payroll records and time sheets at least occasionally, he says that he did so "only at the direction" of Butta and these duties "took a nominal part" of his workday. Pl. 56.1 Counter Stmt. ¶¶ 85-87; Giancotti Decl. ¶ 21; Giancotti Dep. Tr. at 133:2-139:9. There were only "three or four" supervisor meetings Giancotti attended, as he "was regularly kept out of" such meetings. Giancotti Dep. Tr. at 164:8-165:2; Giancotti Decl. ¶ 27. And despite Giancotti sending an email about firing laborers, those workers were never actually fired, as they reported back to work in short order. Giancotti Dep. Tr. at 182:2-186:4. Giancotti never fired anyone, *id.* at 184:4, as even Defendants acknowledge that "he did not have ultimate authority . . . to fire anyone," at least not "without HR involvement," Defts. SJ Br. at 21. Giancotti does not dispute sending two other emails to Riaz: one in which he offered to go with two laborers "and explain what we need" to fix a worksite issue, Ho Decl., Exh.

---

[3] Nicola Gabriele is Giancotti's sister-in-law and worked for Pizzarotti at the Amsterdam Project. Gabriele Decl. ¶¶ 1, 4.

17 at PZ019089, and another in which he opined that the team needed to imminently complete items on a "punch list," Ho Decl., Exh. 19 at PZ019095, which is a document containing a construction project's finishing details, Defts. 56.1 Stmt. ¶ 135. *See id.* ¶¶ 107, 136.

A central dispute between the parties is how often Giancotti operated the Bobcat. Defendants acknowledge that Giancotti "drove the Bobcat at the Amsterdam project approximately 1 to 3 times per week." *Id.* ¶ 119. But, they say, other employees also drove the Bobcat on the Amsterdam Project, and even then, for only up to 3 or 4 days a week for about 4 hours per day. *Id.* ¶¶ 118, 124; Riaz Dep. Tr. at 37:9-22. Giancotti instead claims that as "the only full-time forklift operator on site," he operated the Bobcat about "six hours per day, five days per week." Giancotti Decl. ¶ 16. He agrees that there were alternate drivers on the Amsterdam Project but asserts that they only worked the Bobcat when Giancotti was not doing so himself, as when he "was absent, arrived late, left early, or . . . had been tasked with a higher priority." *Id.* To support that assertion, he cites a timesheet for "Skid Steer Driver" which indicates the days other employees operated the Bobcat and notes whether "Antonio [Was] In" those days. Kafedjian Decl., Exh. O. That timesheet—which reflects that May 5, 2021, was the "1st Day Antonio [Was] On Site," and continues through January 17, 2022—shows several entries where the other Bobcat drivers worked more than four hours per day, including while "Antonio [Was] On Vacation." *Id.* Indeed, Campoccia acknowledged at his deposition that "from May [or] June of 2021," the Bobcat "was used eight hours a day for many days" to install bricks and stones. Campoccia 5/16 Dep. Tr. at 41:9-17. (Campoccia said this Bobcat-intensive period lasted until "maybe July [or] August," *id.* at 41:18-25, while Giancotti claims it lasted until December, Pl. 56.1 Counter Stmt. ¶ 121(c); Kafedjian Decl., Exh. AE.) Nor would Pizzarotti timesheets reflect the time Giancotti spent operating the Bobcat, since Giancotti—as the assistant superintendent—would not have been

included on them.  Butta Dep. Tr. at 79:1-21.

Giancotti also claims that he had problems with payroll.  "There were occasions," he says, when the company "deleted and/or changed [his] time inputs" in the payroll software, and thus "short paid [him]."  Giancotti Decl. ¶ 40.  Still, he concedes that Campoccia "never manually altered" his time records or pay stubs, Defts. 56.1 Stmt. ¶ 53, as those "erroneous manual alteration[s]" "removing time entries and decreasing his pay" were "executed by other" Pizzarotti employees, Pl. 56.1 Counter Stmt. ¶ 53.  Evidence suggests that on at least "two or three occasions" the company wrongly adjusted Giancotti's payment under the assumption that Giancotti had "take[n] non-paid days off so he could save his" paid time off, and then purported to "immediately repa[y] back all" of the missed payments.  Lee Dep. Tr. at 50:12-53:16, 63:13-64:9.  Giancotti also claims that under the employee handbook, he "was entitled to a bonus of $100 for each Saturday worked," which Defendants largely "failed to pay" except "once, in the final weeks of employment," and that at one point he was paid "the extra $200 for two Saturdays worked in June 2021" that "they later deducted."  Giancotti Decl. ¶ 41.  On other occasions, his paychecks were late, which he complained about "many times."  *Id.* ¶ 39.  For instance, on January 27, 2022, Giancotti emailed Campoccia, Butta, Vinci (the CEO), and others noting that his paycheck due that day had "not been issued []or processed," and that the "situation with delayed paychecks has been going on for a while now."  Kafedjian Decl., Exh. J at PZ007135.  Campoccia then emailed Vinci "to discuss" Giancotti's complaint: as Campoccia wrote, "I prefer [to] fire him and not continue to receive this kind of email."  *Id.*

Around that same time (between January 25 and February 1, 2022), Giancotti was transferred back to the 14th Street Project, where he kept his title as assistant superintendent. Campoccia 5/13 Dep. Tr. at 172:2-173:6; Giancotti Decl. ¶ 17; Pl. 56.1 Counter Stmt. ¶ 140.  That

project was run by Maurizio Sciacca, the quality control engineer manager; Palma Sanchez, the assistant project manager; and Francesco Cavarretta, the project manager, who reported to Campoccia. Defts. 56.1 Stmt. ¶¶ 142-144. Giancotti reported to Sciacca, who would give Giancotti tasks and directions on performing certain work. *Id.* ¶¶ 145, 148. (Giancotti claims that he "had very limited interactions" with Sanchez and Cavarretta. Giancotti Decl. ¶ 36.) It is also undisputed that Sciacca would instruct Giancotti on what the laborers had to do for the day, and Giancotti in turn would give the laborers those instructions. Defts. 56.1 Stmt. ¶¶ 149, 164. And Giancotti admits that his supervisors asked for his opinion on the laborers' performance "a couple of times." Giancotti Dep. Tr. at 148:6-149:5. Giancotti further concedes that part of his duties included signing and verifying the laborers' time sheets, taking inventory of the materials the laborers used and informing his supervisors what was needed, and verifying that subcontractors cleaned the jobsite. Defts. 56.1 Stmt. ¶¶ 162-163, 172. On one occasion, Giancotti hand delivered a termination letter to three workers that he says Butta and Sciacca gave him. Giancotti Dep. Tr. at 196:8-25.

While Giancotti does not dispute engaging in those 14th Street Project activities, he claims that those responsibilities were marginal. Giancotti Decl. ¶¶ 20-21. According to Giancotti, when he returned to the 14th Street Project, Campoccia told him that because he "could not read blueprints or work with computers," he "would need to work alongside the laborers and contribute more manually on the jobsite in order to be able to justify [his] salary." *Id.* ¶ 18 (emphasis omitted). His "primary duties," he says, "were to work hands on with other laborers to perform whichever tasks [he] was directed, including cleaning the worksite regularly." *Id.* ¶ 17. (There was no Bobcat or other forklift on site for him to drive. Defts. 56.1 Stmt. ¶ 147.) As Sciacca put it, because Giancotti could not read blueprints—a rarity for assistant superintendents—and

because most of the "big work" on the project was subcontracted out, the work "Giancotti was in charge of" was "very limited" and "minor." Sciacca Dep. Tr. at 38:13-41:15. Giancotti "had all the small jobs to do, like[] moving the offices or doing . . . little work [on] the windows, nothing major." *Id.* at 41:13-15; Giancotti Decl. ¶ 19 (noting that in March 2023, he "move[d] the offices of the managers/executives"). And Giancotti presents a series of text messages in which Sciacca charged him with manual tasks like putting plastic around pipes, filling the worksite with concrete, and arranging office tables. Kafedjian Decl., Exh. P2 at Giancotti000031-000032, 000043-000044, 000049. To the extent Giancotti had to verify that the subcontractors cleaned the site, he claims that was a responsibility Campoccia tasked him and "all other labor[ers]" alike. Kafedjian Decl., Exh. AN at PZ010398.

The parties similarly dispute the degree to which Campoccia and Butta controlled Giancotti's hours. Defendants claim that while Campoccia "sometimes communicated" with Giancotti about his schedule, Campoccia "was not responsible for approving or denying" Giancotti's requests for time off, and "he never approved or denied such requests." Defts. 56.1 Stmt. ¶ 50. Instead, according to Defendants, Giancotti would need approval for time off from Sanchez or Cavaretta, the 14th Street Project's assistant project manager and project manager. *Id.* ¶ 49. But Defendants concede that Campoccia "approved timecards"—including Giancotti's—"and signed off on certified payroll for a brief period of time," at least from January 2022 through May 2022. *Id.* ¶ 54; Pl. 56.1 Counter Stmt. ¶ 54; Campoccia 5/13 Dep. Tr. at 130:2-18; *see also* Kafedjian Decl., Exh. U1 (Campoccia certifying payroll hours on the Amsterdam Project). And Giancotti asserts that, if he "needed time off," he "was required to seek permission from" Campoccia, his supervisor. Giancotti Decl. ¶ 35; Giancotti Dep. Tr. at 28:8-13. Indeed, Giancotti cites to emails where Pizzarotti's Assistant Controller claimed that she was "not the person who

approves your timecard and vacation days," which was "something for you to discuss with your supervisor," at which point Campoccia told Giancotti that the company would not pay for workdays taken off where vacation days were not available—even though "I don't have [a] problem that you go to vacation." Kafedjian Decl., Exh. W at PZ007297-007298. And Campoccia admitted that Giancotti would direct vacation requests to him. Campoccia 5/16 Dep. Tr. at 24:17-25:2. As for Butta, his involvement primarily ramped up during the last three weeks of Giancotti's employment. *See* Giancotti Dep. Tr. at 28:8-20 (acknowledging that aside from those three weeks, he did not typically need Butta's permission to miss work, although he would keep Butta informed); Giancotti Decl. ¶ 34 (similar).[4]

The events leading up to Giancotti's April 19, 2023, termination are fiercely disputed. On Defendants' telling, Giancotti was terminated because Pizzarotti "no longer had a need for his position and the work on the 14th Street project was winding down." Defts. 56.1 Stmt. ¶ 180; *see* Butta Dep. Tr. at 160:5-10. And indeed, it is undisputed that a month before Giancotti's termination, several of the laborers on the project were let go for this very reason. Defts. 56.1 Stmt. ¶ 181; Sciacca Dep. Tr. at 85:12-87:14. It appears that these were the laborers to whom Giancotti had delivered the termination letters. *See* Butta Dep. Tr. at 161:10-14; Giancotti Dep. Tr. at 196:8-25. It is also undisputed that after Giancotti was terminated, Pizzarotti did not hire another assistant superintendent; instead, his work was done by Riaz, the Amsterdam Project superintendent. Defts. 56.1 Stmt. ¶ 182. Defendants thus insist that Giancotti lost his job as a matter of simple redundancy.

Giancotti sees things quite differently. Notwithstanding the 14th Street Project's

---

[4] To the extent Giancotti relies on the record evidence to claim that he was generally "*required* to report to Mr. Butta if and when he was leaving early from his shift," Pl. 56.1 Counter Stmt. ¶¶ 34, 37 (emphasis added), that claim is plainly belied by his own testimony.

winddown, Giancotti says that he was asked by Campoccia about his willingness to transfer to another Pizzarotti job in Italy rather than getting let go.  Kafedjian Decl., Exh. AO (errata sheet for Giancotti's deposition).  Instead, the beginning of the end was on March 24, 2023, when Giancotti noticed that his timesheet entries had been "deleted" and that he "received a smaller paycheck than [he] was entitled to."  Giancotti Decl. ¶ 44.  So he reached out to Campoccia about the issue, and texted Butta explaining that any partial pay deductions were "not allowable under the Fair Labor Standards Act."  *Id.*; Kafedjian Decl., Exh. Y at PZ018562.  That evening, Campoccia singled out Giancotti in a group chat and told him that starting immediately, he would have to "work every weekday until 6pm and every Saturday as well."  Giancotti Decl. ¶ 45.  A few days later, Giancotti followed up with Butta, who responded by accusing Giancotti of not working enough hours and ordering him to start signing in and out like the laborers.  *Id.* ¶ 46; Kafedjian Decl., Exh. K at Giancotti000341-000342 (Giancotti's handwritten timesheets).  It is undisputed that for the last three weeks of Giancotti's employment, Butta requested that Giancotti submit those hours to him.  Defts. 56.1 Stmt. ¶ 35.  At the same time, in an email to company management, Butta acknowledged that there had "for sure" been "a mistake," as "[b]y counting the hours" Giancotti worked, he "should have been paid" more than he actually had.  Kafedjian Decl., Exh. Y at PZ018558.

On April 6, Giancotti once again followed up with Butta, Campoccia, and others with "a few questions regarding [his] pay."  Kafedjian Decl., Exh. AB at Giancotti000343.  In an email, he expressed his "concerns" that under the FLSA and the NYLL he had been misclassified as an employee exempt from overtime requirements, along with other potential labor-law violations.  *Id.* at Giancotti000343-000345; Giancotti Decl. ¶ 47.  That same day, Campoccia responded by emailing Giancotti that he was "no longer allowed" on the 14th Street Project "or any other [of]

Pizzarotti's projects" "[c]onsidering all [his] latest ongoing allegations against the company." Kafedjian Decl., Exh. AA at Giancotti000353. (Defendants do not dispute that Campoccia "delivered the suspension" to Giancotti, although they claim that the company's "legal department made the decision." Defts. 56.1 Stmt. ¶ 60; Campoccia 5/13 Dep. Tr. at 193:2-9.) And Campoccia informed Pizzarotti colleagues that Giancotti was banned from company worksites. Kafedjian Decl., Exh. AA at Giancotti000352. A company document from that day reflects a contemplated position and pay demotion for Giancotti: from an assistant superintendent making $104,000 a year back to a laborer making $25 an hour. Kafedjian Decl., Exh. Z at PZ09368.

Rather than demoting Giancotti, Pizzarotti terminated him on April 19, 2023. Defts. 56.1 Stmt. ¶ 186. That day, the company sent him a letter signed by Gun Lee, Pizzarotti's Financial Controller, explaining the decision. Kafedjian Decl., Exh. N at Giancotti000161. The company, Lee explained, "consulted with its attorneys" following Giancotti's "latest ongoing allegations," and relied on an "investigation" with human resources and Giancotti's "direct supervisors and colleagues" to "evaluate [his] allegations in relation to [his] performance." *Id.* at Giancotti000158. It cited "several issues" from "an HR perspective" that had been raised about Giancotti's "attitude towards hours worked and vacation time": on several occasions he "came to work very late" or left "very early," and he "want[ed] to use more vacation days than the vacation time provided" which "generated issues with [his] timecard," as he would arrange to "take off the day without pay to save vacation days for later" but then "complain[] about the short payment and request[] afterwards to use vacation days or PTO instead." *Id.* Neither the FLSA nor the NYLL, claimed Pizzarotti, required the company to pay Giancotti in those circumstances. *Id.* at Giancotti000158-000159.

As for those labor laws' overtime requirements, the termination letter asserted that

Giancotti fell "under the Administrative Exemption" because his "primary job duties" were to "oversee construction workers and laborers" on the 14th Street and Amsterdam Projects, "not [to] perform construction work." *Id.* at Giancotti000159 (citing 29 U.S.C. § 213(a)(1)). The company elaborated on Giancotti's promotion to assistant superintendent and duties at both the Amsterdam and 14th Street sites: he was offered the role because Pizzarotti "was looking to fill that position" and he was "looking for a promotion and/or salary increase." *Id.* at Giancotti000160. So "in the good faith effort" to help Giancotti with his "family [financial] situation," the company "decided to give [him] the opportunity"—"[e]ven if [Giancotti] did not possess all the necessary requirements and qualifications for that position." *Id.* While at the Amsterdam Project, Giancotti's "primary duty" was "to support the Superintendent in his duties, including managing and supervising laborers, coordinating the activities with the Superintendent and the Site Safety Manager, providing reports and updates to the field office when requested, and even terminating labor[ers]." *Id.* And although the company conceded that Giancotti was "also operating the forklift" "occasionally during the day," doing so was "not as part of [his] primary duties." *Id.* At the 14th Street Project, Giancotti's "primary duty" was similarly to support the "Superintendent and the Quality Control Manager in their duties, including managing and supervising Pizzarotti's laborers, checking subcontractors['] work, and coordinating with the field office." *Id.* The company again conceded that Giancotti "performed minor manual work," but maintained that this occurred only "on rare occasions" and "not as part of [his] primary duties." *Id.* At both sites, claimed the company, Giancotti's "performance and commitment" were "evaluated" by his "supervisor and colleagues" as "poor." *Id.* at Giancotti000160-000161. "Based on all the above," concludes the termination letter, and "considering [Giancotti's] allegations," Pizzarotti was "left with no choice but to terminate [his] employment for cause" effective immediately on April 19,

14

2023.  *Id.* at Giancotti000161.

**B.    Procedural History**

Giancotti brought this case on April 25, 2023, six days after his termination.  Dkt. 1 ("Compl.").  Defendants answered the Complaint on July 6, 2023, Dkt. 19, and discovery closed on July 5, 2024, Dkt. 34.  Originally, Lee (the Financial Controller) was also named as a Defendant, and the Complaint included a claim for breach of a Public Works Contract.  Compl. ¶¶ 23, 129-133.  But the parties agreed to dismiss Lee with prejudice and the Public Works Contract claim without prejudice on July 29, 2024.  Dkt. 43.  That leaves eight claims: violation of the FLSA's overtime provision, 29 U.S.C. § 207(a)(1) (Claim Two); violation of the NYLL's overtime provisions, N.Y. Lab. Law §§ 190 *et seq.* (Claim Three); violation of the NYLL's wage-notice provision, N.Y. Lab. Law § 195(1) (Claim Four); violation of the NYLL's wage-statement provision, N.Y. Lab. Law § 195(3) (Claim Five); violation of the NYLL's timely-payment provision, N.Y. Lab. Law § 191 (Claim Six); violation of the NYLL's deduction provision, N.Y. Lab. Law § 193 (Claim Seven); violation of the FLSA's retaliation provisions, 29 U.S.C. § 215(a)(3) (Claim Eight); and violation of the NYLL's retaliation provision, N.Y. Lab. Law § 215 (Claim Nine).  Compl. ¶¶ 134-170.

On November 12, 2024, Defendants moved for summary judgment on the remaining claims.  Dkts. 46-47.  Giancotti filed his opposition on January 10, 2025.  Dkts. 48-51, 52 ("Pl. SJ Opp.").  Defendants filed their reply on February 10, 2025.  Dkt. 55 ("Defts. SJ Reply").

**II.  Standard of Review**

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate '[w]here the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party.'" *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting this review, the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'" *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)). The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted). The non-movant must present more than a "scintilla of evidence" to survive summary judgment. *Anderson*, 477 U.S. at 252. "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

## III. Discussion

The Court first considers whether Campoccia and Butta were Giancotti's employers under the FLSA and the NYLL before turning to each of Giancotti's claims.

16

A.      **Campoccia's and Butta's Status as Giancotti's Employers**

The relevant provisions of the FLSA and the NYLL apply to an "[e]mployer." 29 U.S.C.

§ 203(d); N.Y. Lab. Law §§ 190(3), 651(6). Under the FLSA, an employer "includes any person

acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C.

§ 203(d). And a person "means an individual, partnership, association, corporation, business trust,

legal representative, or any organized group of persons." *Id.* § 203(a). The NYLL defines

employer as "any person, corporation, limited liability company, or association employing any

individual in any occupation, industry, trade, business or service." N.Y. Lab. Law § 190(3); *see*

*also id.* § 651(6) (covering "any individual . . . acting as employer"). These federal and state

definitions, while not identical, are generally interpreted "coextensively." *Gao v. Savour Sichuan*

*Inc.*, No. 19 Civ. 2515 (JPC), 2024 WL 664718, at *16 (S.D.N.Y. Feb. 16, 2024); *see also Tapia*

*v. BLCH 3rd Ave LLC*, 906 F.3d 58, 61 n.1 (2d Cir. 2018).

The Second Circuit treats employer status "as a flexible concept to be determined on a

case-by-case basis by review of the totality of the circumstances." *Barfield v. New York City*

*Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008). The "underlying inquiry in

determining 'employer' status is whether the individual possessed operational control over

employees." *Tapia*, 906 F.3d at 61. An individual "exercises operational control over employees

if his or her role within the company, and the decisions it entails, directly affect the nature or

conditions of the employees' employment." *Irizarry v. Catsimatidis*, 722 F.3d 99, 110 (2d Cir.

2013). "[R]elevant to this inquiry" are what are known as the "*Carter* factors," *Tapia*, 906 F.3d

at 61, namely whether the alleged employer: "(1) had the power to hire and fire the employees, (2)

supervised and controlled employee work schedules or conditions of employment, (3) determined

the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess*

*Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984) (citation omitted). "No one of the four factors standing

alone is dispositive." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).

There is no dispute that Pizzarotti, the company, was Giancotti's employer under the FLSA

and the NYLL. *See, e.g.*, Defts. 56.1 Stmt. ¶ 63. But Campoccia and Butta seek summary

judgment on all of Giancotti's claims, asserting that they were not, individually, his employer.

Defts. SJ Br. at 27-35. The Court considers each's status as an employer in turn.

### 1.  Campoccia's Employer Status Is in Genuine Dispute

As for Campoccia, the Court finds triable issues of fact on all four *Carter* factors. Starting

with the first and third—having the power to hire and fire employees and determining the rate and

method of their payment, *Carter*, 735 F.2d at 12—Campoccia claims that he "did not have the

power to hire or fire" Pizzarotti employees and "did not manage" their paychecks, asserting that

"HR must approve all hires and their salaries." Defts. 56.1 Stmt. ¶¶ 47, 59.[5] But record evidence

puts those contentions in dispute. For one, Butta emailed the company's human resources manager

that "Ignazio [Campoccia] agreed" in May 2021 to "a weekly pay of $2000 per week with Antonio

Giancotti" for the position of assistant superintendent, and asked her to "please prepare the new

contract." Kafedjian Decl., Exh. I at PZ005163-005165; *see also* Butta Dep. Tr. at 87:7-88:11

(explaining that "Ignazio [Campoccia]" thought Giancotti could fill the assistant superintendent

position). For another, Pizzarotti management acknowledged that as both COO and project site

executive, Campoccia would have had input into the hiring of employees, Vinci Dep. Tr. at 18:12-

19:22, 24:18-25:14, and the "power to sign . . . position rate change[s]," Lee Dep. Tr. at 38:11-

---

[5] In support of this assertion, Defendants cite a portion of Giancotti's deposition when he
said Campoccia "wouldn't directly fire anyone." Defts. 56.1 Stmt. ¶ 47 (citing Giancotti Dep. Tr.
at 58:12-14). But read in context, it is fair to infer that Giancotti meant Campoccia would not fire
anyone in person, although Campoccia still "would make the decision." Giancotti Dep. Tr. at
57:8-13.

39:22. And Vinci, the CEO, could not recall an instance of human resources vetoing the hiring decision of a company executive like Campoccia. Vinci Dep. Tr. at 34:11-36:14. Defendants' reliance on human resources also fails to acknowledge the undisputed fact that that department "was eventually eliminated due to downsizing in 2022," Defts. 56.1 Stmt. ¶ 3, and Vinci's testimony that from that point on, the power to fire employees would have rested with him and Campoccia, Vinci Dep. Tr. at 17:5-18:11. There is, at the very least, a genuine dispute of fact over Campoccia's power to hire, fire, and set the rates of Pizzarotti employees.

The same is true for the second *Carter* factor. Record evidence suggests that Campoccia supervised and controlled Giancotti's work schedule and conditions of employment. *See Carter*, 735 F.2d at 12. Defendants admit that Campoccia "sometimes communicated with Plaintiff about his schedule," although they deny that Campoccia had or exercised the authority to sign off on Giancotti's paid-time-off requests. Defts. 56.1 Stmt. ¶ 50. Giancotti disputes the limited nature of that authority, claiming that he "was required to seek permission from" Campoccia if he needed time off, Giancotti Decl. ¶ 35; Giancotti Dep. Tr. at 28:8-13, and citing an email suggesting Campoccia was the person to whom any vacation requests should be directed, Kafedjian Decl., Exh. W at PZ007297-007298. *See also* Campoccia 5/16 Dep. Tr. at 24:17-25:2 (admitting that Giancotti "asked" him "to have vacation days"). And it was Campoccia, Giancotti asserts, who told him in March 2023, after he complained about his pay issues, that he would "be required to work every weekday until 6pm and every Saturday as well." Giancotti Decl. ¶ 45. Defendants further admit that Campoccia "would communicate directly with Plaintiff about issues that required immediate attention," at least "[o]casionally." Defts. 56.1. Stmt. ¶ 55. *But see id.* ¶ 58 ("Campoccia was not responsible for managing Plaintiff on a day-to-day basis."). Giancotti, for his part, asserts that Campoccia "would direct" him to do tasks "on a day-to-day-basis." Giancotti

Decl. ¶ 35.  Campoccia's control over Giancotti's schedule and work conditions thus is in genuine dispute as well.

Finally, there is evidence—some of which undisputed—that Campoccia "maintained employment records."  *Carter*, 735 F.2d at 12.  Giancotti claims that Campoccia "had the authority to approve and/or alter his timecard throughout [his] employment."  Pl. 56.1 Counter Stmt. ¶ 54.  And Defendants concede that "Campoccia approved timecards and signed off on certified payroll for" at least a "brief period of time."  Defts. 56.1 Stmt. ¶ 54.  As the Second Circuit has explained, control may be "exercised only occasionally[] without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence."  *Herman*, 172 F.3d at 139 (citation modified).  A reasonable jury could thus find the fourth *Carter* factor met, too.

As genuine disputes of fact exist across the *Carter* factors, summary judgment on Campoccia's employer status is denied.  *See, e.g.*, *Greenawalt v. AT & T Mobility LLC*, 642 F. App'x 36, 40 (2d Cir. 2016) (summary order) (explaining that "a reasonable jury could find, under the facts of this case," that the defendant "was plaintiffs' joint employer for purposes of FLSA" when "[v]iewing the evidence in the light most favorable to plaintiffs, no [joint-employment] factor weighs against joint employment as a matter of law").

### 2.  Butta's Employer Status Is Also Genuinely Disputed

Butta poses a closer question.  On the first *Carter* factor, most of Giancotti's evidence focuses on Campoccia's power to hire and fire employees.  But there is some evidence suggesting Butta played a role in hiring and firing as well.  Defendants acknowledge that Butta "was present when Plaintiff asked Mr. Campoccia for a pay raise" and promotion in May 2021 even if he played "no meaningful role" in those discussions, Defts. 56.1 Stmt. ¶ 32, while Giancotti asserts that Butta

20

participated in the meeting where all three "negotiated a potential promotion," Giancotti Decl.
¶¶ 7-10. Giancotti also cites evidence that Butta helped hire Riaz, the Amsterdam Project's
superintendent, Riaz Dep. Tr. at 27:24-29:6; the hiring of "managerial staff" is "a strong indication
of control," *Herman*, 172 F.3d at 140. Plus, Giancotti claims he had been given the termination
letter for three laborers at the 14th Street Project by "Butta and Maurizio Sciacca," the project's
quality control engineer manager. Giancotti Dep. Tr. at 196:8-20. Sufficient evidence exists to
put Butta's hiring-and-firing authority into genuine dispute.

Sufficient evidence also suggests that Butta meets the second *Carter* factor, *i.e.*, that he
supervised and controlled work schedules or conditions. Most notably, Defendants acknowledge
that "*[e]xcept for the Plaintiff's last three weeks of employment*, Mr. Butta did not set Plaintiff's
hours, did not tell him what time he had to be at work, and had nothing to do with Plaintiff's work
schedule." Defts. 56.1 Stmt. ¶ 34 (emphasis added); *see also* Butta Dep. Tr. at 119:13-15
(acknowledging the decision "to check and control the hours that Antonio [Giancotti] worked").
That acknowledgment implicitly concedes that Butta *did* supervise and control Giancotti's work
schedule at least for some time, which may well suffice. *See Herman*, 172 F.3d at 139. And
although it is undisputed that "[a]t no time did Mr. Butta direct the day-to-day work of any
[Pizzarotti] laborers," Defts. 56.1 Stmt. ¶ 39, Giancotti claims that as "part of [his] duties," he was
"directed by Mr. Butta to take daily attendance reports for the laborers, and to submit them to
[Butta] on a daily basis," Giancotti Decl. ¶ 21; Giancotti Dep. Tr. at 48:14-20, 50:8-51:8. So there
is a genuine dispute as to Butta's control over Giancotti's schedule and conditions of employment.

As for the third *Carter* factor, just enough evidence exists on Butta's authority over pay.
There is, of course, his disputed involvement in negotiating Giancotti's promotion and pay raise.
*See* Giancotti Decl. ¶¶ 7-10. Plus, Butta emailed Lee (the company's Financial Controller) in

March 2023 after Giancotti complained about being shortchanged, acknowledging the "mistake" over what Giancotti "should have been paid" and asking Lee to "let [Butta] know what is the . . . correct way to proceed." Kafedjian Decl., Exh. Y at PZ018558. But even were there no genuine dispute over this factor, that would not entitle Butta to summary judgment as a matter of law. As the employer-status test is "based upon *all* the circumstances," none "of the four factors standing alone is dispositive." *E.g.*, *Herman*, 172 F.3d at 139-41 (finding that employer status was established where not all the *Carter* factors were met); *Irizarry*, 722 F.3d at 115-16 (same).

Finally, there is undisputed evidence, for purposes of *Carter*'s fourth factor, that Butta maintained employment records, at least for a time. Defendants concede that "[d]uring the last three weeks of Plaintiff's employment, Mr. Butta requested Plaintiff submit his work hours to him." Defts. 56.1 Stmt. ¶ 35. And even if Butta maintained such records only temporarily—which Giancotti disputes, *see* Pl. 56.1 Counter Stmt. ¶ 29; Giancotti Decl. ¶¶ 21, 34—the "only occasional[]" exercise of such control does "not diminish the significance of its existence," *Herman*, 172 F.3d at 139 (internal quotation marks and citations omitted).

At bottom, while the evidence as to Butta's employer status is leaner than that for Campoccia, a reasonable jury could still find that he was Giancotti's employer. That conclusion tracks the Second Circuit's observation that awards of summary judgment on the "fact-intensive" question of an individual employer's liability "are rare." *Greenawalt*, 642 F. App'x at 37 (quoting *Barfield*, 537 F.3d at 143-44). So with a general dispute of material fact as to whether Campoccia and Butta qualify as Giancotti's employer for purposes of the FLSA and the NYLL, these Defendants' grounds for summary judgment rise and fall with those of Pizzarotti's.

**B.    Claims Two and Three: FLSA and NYLL Overtime Provisions**

The FLSA and the NYLL generally require employers to pay their employees time-and-a-

half for hours worked above forty in a single week.  *See* 29 U.S.C. § 207(a)(1); 12 N.Y.C.R.R. § 142-2.2.  The requirement to pay overtime, however, is subject to various exemptions, including an exemption for employees who serve "in a bona fide executive . . . capacity."  29 U.S.C. § 213(a)(1); N.Y. Lab. Law § 651(5)(b).  As an affirmative defense to liability under the FLSA and the NYLL, the employer bears the burden of proving that the executive exemption applies to a particular employee.  *Mullins v. City of New York*, 653 F.3d 104, 113 (2d Cir. 2011) ("The employer who invokes the exemption bears the burden of establishing that the employee falls within the exemption.").  And whether that exemption applies in a given case is a "mixed question of law and fact."  *Pippins v. KPMG, LLP*, 759 F.3d 235, 239 (2d Cir. 2014) ("The question of how the employees spent their working time is a question of fact. The question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law." (internal quotation marks and citation omitted)).  Because the FLSA's and the NYLL's executive exemptions are, for the most part, identical, the Court (like the parties) focuses its analysis on the FLSA.  *See Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.1 (2d Cir. 2012).

The Department of Labor has promulgated regulations further defining the FLSA's executive exemption, and the parties agree that those regulations control in this case.[6]  The applicable regulations when Giancotti served as assistant superintendent defined an "employee employed in a bona fide executive capacity" as any employee:

> (1) Compensated on a salary basis pursuant to [29 C.F.R.] § 541.600 at a rate of not less than $684 per week . . . ;
>
> (2) Whose primary duty is management of the enterprise in which the employee is

---

[6] As the FLSA expressly provides that "such terms" as the bona fide executive exemption may be "defined and delimited from time to time by regulations of the Secretary" of Labor, 29 U.S.C. § 213(a)(1), those regulations permissibly allow the Department of Labor "to give meaning to a particular statutory term," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95 & n.5 (2024) (citing 29 U.S.C. § 213(a)).

employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100 (2020). As the Supreme Court recently explained, this bona fide executive standard "comprise[s] three distinct parts." *Helix Energy Sols., Grp. v. Hewitt*, 598 U.S. 39, 44-45 (2023). The first two parts—tracking subsection (1), above—pertain to the employee's salary: a bona fide executive employee must meet both the "salary basis" test, in which he "receives a predetermined and fixed salary" which "does not vary with the precise amount of time he works," and the "salary level" test, in which "that preset salary exceeds a specified amount." *Id.* (internal quotation marks and citations omitted). The third part—tracking subsections (2) through (4), above—is the "duties" test, "which focuses on the nature of the employee's job responsibilities." *Id.* Only if all three parts of the standard are met is "the employee (because considered a bona fide executive) . . . excluded from the FLSA's protections," including overtime. *Id.*

There is no dispute that Giancotti meets the "salary level" test, as his $104,000 a year salary comfortably exceeded the minimum salary thresholds under both the FLSA and the NYLL. *See* Pl. SJ Opp. at 19 ("Plaintiff met the monetary threshold for the salary basis.").[7] But he argues that there are genuine factual disputes as to whether he was compensated on a salary basis and whether his duties were those of a bona fide executive. The Court agrees with Giancotti that genuine factual disputes exist as to those two components of the bona fide executive standard.

---

[7] The Court notes that Giancotti's $104,000 a year salary fell just under the $107,432 a year threshold to trigger the "highly compensated employees" executive exemption standard, under which "the duties test becomes easier to satisfy." *Helix Energy Sols. Grp.*, 598 U.S. at 45-46; *see* 29 C.F.R. § 541.601 (2020). The parties do not argue that this standard applies.

### 1.  There Is a Genuine Dispute About Whether Giancotti Was Paid on a Salary Basis

Under the Department of Labor's regulations, an employee is paid on a "salary basis" if he "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."  29 C.F.R. § 541.602(a). An "exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked," although he "need not be paid for any workweek in which [he] perform[ed] no work."  *Id.* § 541.602(a)(1).  However, the "prohibition against deductions from pay in the salary basis requirement" is subject to a relevant exception: "Deductions from pay may be made when an exempt employee is absent from work for one or more full days for personal reasons, other than sickness or disability."  *Id.* § 541.602(b)(1).

An employee is not paid on a salary basis when there exists an "employment policy creating a 'significant likelihood' of impermissible pay deductions" or "an 'actual practice' of making impermissible pay deductions."  *Yourman v. Giuliani*, 229 F.3d 124, 128-29 (2d Cir. 2000) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).  A deduction policy must be "clear and particularized," "effectively communicat[ing] that deductions will be made in specified circumstances."  *Havey v. Homebound Mortg., Inc.*, 547 F.3d 158, 163 (2d Cir. 2008) (quoting *Auer*, 519 U.S. at 461).  And as Department of Labor regulations elaborate, the

> factors to consider when determining whether an employer has an actual practice of making improper deductions include, but are not limited to: the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline; the time period during which the employer made improper deductions; the number and geographic location of employees whose salary was improperly reduced; the number and geographic location of managers responsible for taking the improper deductions; and whether the employer has a clearly communicated policy permitting or prohibiting improper deductions.

29 C.F.R. § 541.603(a).  But "the object of the" actual-practice inquiry is "whether the employer's

practices reflect an 'objective intention' to pay its employees on a salaried basis." *Yourman*, 229 F.3d at 130; *see also* 29 C.F.R. § 541.603(a). Thus, "[i]mproper deductions that are either isolated or inadvertent will not result in loss of the exemption for any employees subject to such improper deductions, if the employer reimburses the employees for such improper deductions." 29 C.F.R. § 541.603(c).

Giancotti points to no established Pizzarotti policy of impermissible deductions but has come forward with just enough evidence to suggest an actual practice of making such deductions.[8] He says that Pizzarotti paid him "according to [his] hours worked, docking [his] pay if [he] was early or late on any day." Giancotti Decl. ¶ 40 (citing Kafedjian Decl., Exhs. AO, Y, AB). One of his cited exhibits for that claim is completely irrelevant to his pay. *See* Kafedjian Decl., Exh. AO (errata sheet for Giancotti's deposition testimony concerning Campoccia asking whether Giancotti "would be willing to transfer to Italy to continue working" for Pizzarotti). The other two, however, place an actual practice of deductions in dispute. First, Butta emailed Lee in March 2023, explaining that "[l]ast week Antonio Giancotti was paid 62 hours," which was "for sure a mistake," as "[b]y counting the hours Antonio worked he should have been paid 73.5 hours" instead. Kafedjian Decl., Exh. Y at PZ018558. Indeed, in coming to that conclusion, Butta spelled out the hours Giancotti worked that week: "He did not come on the 9th, he came to work on the

---

[8] The Court observes that the current Department of Labor regulations do not set out an employer's deduction policy as independent grounds to lose the exemption; instead, "whether the employer has a clearly communicated policy permitting or prohibiting improper deductions" is a "factor[] to consider when determining whether an employer has an actual practice of making improper deductions," and it is that actual practice, in turn, which "demonstrates that the employer did not intend to pay employees on a salary basis." 29 C.F.R. § 541.603(a); *see also, e.g.*, *Escribano v. Travis Cnty.*, 947 F.3d 265, 274 (5th Cir. 2020). In any event, "the policy inquiry is ill-suited" here, as "[w]hen real deductions are alleged to have occurred, proving the policy" to establish the "*threat* of impermissible salary deductions" rather "than the actual occurrence of the deduction itself is superfluous." *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 456 n.5 (S.D.N.Y. 2008).

14th but he had to leave early (10AM), he came to work on the 16th but he had to leave early (2:30 PM), and he [came] to work on Saturday [the] 11th." *Id.*  And Butta acknowledged Giancotti's argument that "in the US it does not matter if one day you work 1 hour or 10 hours, since his contract is salary (and not hourly) he should have been paid 80 hours without deducting any time off." *Id.*  The second is an email exchange between Lee and Giancotti in April 2023, in which Lee acknowledged that Giancotti had previously been "short-paid" as he had assumed that Giancotti had "take[n] time off without pay."  Kafedjian Decl., Exh. AB at Giancotti000350-000351.  Lee "apologize[d] for the miscommunication" and claimed to have "included [Giancotti's] missing 18 hours from [the] previous pay period in the current pay period, which [Giancotti] should have received" that day.  *Id.*

Drawing all reasonable inferences in Giancotti's favor, the record raises the possibility that Defendants had not previously paid Giancotti a full salary "without regard to the number of days or hours [he] worked."  29 C.F.R. § 541.602(a)(1).  True, "courts have looked skeptically on single-incident docking of pay as proof that an employer did not intend to pay an employee on a salary basis."  *Stein v. Guardsmark, LLC*, No. 12 Civ. 4739 (JPO), 2013 WL 3809463, at *6 (S.D.N.Y. July 23, 2013); *see also Coleman-Edwards v. Simpson*, 330 F. App'x 218, 220 (2d Cir. 2009) (summary order).  But Lee acknowledged that he made such deductions on Giancotti's pay on about "two or three occasions."  Lee Dep. Tr. at 51:9-52:25.  And Butta himself pointed to the decision "to check and control the hours that Antonio [Giancotti] worked in order that his timecard . . . match[ed] the … actual presence on site," because otherwise "Antonio [Giancotti] would've been paid full salary, even if he never came to work for us."  Butta Dep. Tr. at 119:3-120:1 ("[H]is time card didn't match his actual presence in the work site as it was presented.").  Defendants' argument that these deductions were permissibly made "for full-day absences for

personal reasons," Defts. SJ Reply at 7 (citing 29 C.F.R. § 541.602(b)), elides evidence indicating they were based on a "mistake" in "counting the hours Antonio [Giancotti] worked," Kafedjian Decl., Exh. Y at PZ018558; Butta Dep. Tr. at 118:7-22. Even if "such improper deductions" were "isolated or inadvertent," the record further is unclear whether Defendants actually "reimburse[d]" Giancotti such that those deductions would "not result in loss of the exemption." 29 C.F.R. § 541.603(c). It will be for the jury to ultimately decide whether "the facts demonstrate that [Defendants] did not intend to pay" Giancotti on a salary basis." *Id.* § 541.603(a).

### 2. A Genuine Dispute Exists Over Giancotti's Duties

Even were it undisputed that Giancotti satisfied the salary-level and salary-basis tests, *see id.* § 541.100(a)(1), to be an exempt executive he would still have to meet all three prongs of the duties test. *See Helix Energy Sols. Grp.*, 598 U.S. at 45-46, 58.[9] That is, (a) his "primary duty" must have been the "management of the enterprise in which [he was] employed"; (b) he must have "customarily and regularly direct[ed] the work of two or more other employees"; and (c) he must have had "the authority to hire or fire other employees," or his "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [were] given particular weight." 29 C.F.R. § 541.100(a)(2)-(4). Because summary judgment "is appropriate on an executive exemption claim" only when all three duties requirements "are satisfied," a genuine dispute even as to just one suffices to defeat an employer's summary judgment motion. *Giallanzo v. City of New York*, 630 F. Supp. 3d 439, 452, 457 (S.D.N.Y. 2022) (citation omitted); *see also Paganas v. Total Maint. Sol., LLC*, 726 F. App'x 851, 853-55 (2d Cir. 2018) (summary order). At least that much is true here.

---

[9] If Giancotti were considered a highly compensated employee—which he is not, *see supra* at n.7—he would need to "'regularly perform[]' just one (not all) of the three responsibilities listed." *Helix Energy Sols. Grp.*, 598 U.S. at 45-46 (quoting 29 C.F.R. § 541.601(a)).

### a.  Whether Giancotti's Primary Duty Was Management Is Genuinely Disputed

To be exempt as an executive, Giancotti's "primary duty" must be the "exempt work" of "management."  29 C.F.R. §§ 541.100(a)(2), 541.700(a).  Management, per Department of Labor regulations, includes

> activities such as interviewing, selecting, and training of employees; setting and adjusting their pay rates and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.* § 541.102.

"The term 'primary duty' means the principal, main, major or most important duty that the employee performs."  *Id.* § 541.700(a).  Determining the employee's primary duty is "based on all the facts in a particular case," with a "major emphasis on the character of the employee's job as a whole."  *Id.*  Relevant factors include "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  *Id.*

As Department of Labor regulations explain, while the "amount of time spent performing exempt work" is "not the sole test," it is nevertheless "a useful guide in determining whether exempt work is the primary duty of an employee."  *Id.* § 541.700(b).  "Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty

requirement." *Id.* "The inverse," teaches the Second Circuit, "must also be true: employees who spend most of their time performing non-exempt work generally do *not* satisfy the primary duty requirement." *Sydney v. Time Warner Ent.-Advance/Newhouse P'ship*, 751 F. App'x 90, 94 (2d Cir. 2018) (summary order). Still, "nothing" in the regulations "requires that exempt employees spend more than 50 percent of their time performing exempt work," which is why courts must consider "the other factors" to determine whether the employee breaks the general mold. 29 C.F.R. § 541.700(b); *see also Sydney*, 751 F. App'x at 94.

Department of Labor regulations elaborate on the mix between exempt and other types of work. "Work that is 'directly and closely related' to the performance of exempt work is also considered exempt work." 29 C.F.R. § 541.703(a). Directly and closely related work is that which is "related to exempt duties" and "contribute[s] to or facilitate[s] performance of exempt work." *Id.* "All other work is considered 'nonexempt.'" *Id.* § 541.702. As for executives specifically, the regulations recognize that such employees may "concurrent[ly]" perform exempt and nonexempt work: "Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work." *Id.* § 541.106(a). By contrast, "the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods." *Id.*

The Court finds genuine disputes as to several material facts pertaining to whether Giancotti's primary duty was management. Most notably, the time Giancotti spent operating the Bobcat forklift and performing other manual tasks is heavily disputed. Giancotti claims he "spent on average 90% of [his] workday engaging in manual labor." Giancotti Decl. ¶ 15. He insists that other tasks that more closely resemble management, like translating supervisors' instructions and

having the laborers fill out daily attendance forms, took up "a nominal part of [his] workday." *Id.* ¶¶ 20-21; Pl. 56.1 Counter Stmt. ¶ 10(e). Indeed, other record evidence allows the inference that Giancotti spent more than fifty percent of his time doing work other than management and tasks closely related to management, "rais[ing] a genuine dispute as to whether his primary responsibilities were management activities." *Paganas*, 726 F. App'x at 853-54 (finding a "genuine issue of fact" as to the plaintiff's primary duty where he testified "that 90 percent of his work was non-supervisory physical cleaning").

At the Amsterdam Project, Giancotti asserts that he was the "only full-time forklift operator on site" and operated the Bobcat about "six hours per day, five days per week." Giancotti Decl. ¶ 16. That assertion is supported by a timesheet suggesting that Giancotti was the primary Bobcat operator, *see* Kafedjian Decl., Exh. O, and Campoccia's acknowledgment that for at least a few months, the forklift "was used eight hours a day for many days" to install bricks and stones, Campoccia 5/16 Dep. Tr. at 41:11-15. As Giancotti explained in his deposition, he would "keep an eye on the other laborers to make sure they did their jobs" only when he was not driving the Bobcat. Giancotti Dep. Tr. at 171:2-23. And even at the 14th Street Project, where there was admittedly no forklift for Giancotti to operate, some evidence corroborates his claim that his "primary duties were to work hands on with other laborers to perform whichever tasks [he] was directed, including cleaning the worksite regularly." Giancotti Decl. ¶ 17. For one, he alleges that Campoccia told him he "would need to work alongside the laborers and contribute *more manually* on the jobsite in order to be able to justify [his] salary." *Id.* ¶ 18. For another, it is undisputed that Sciacca, the project's quality control engineer manager, would "give directions" to Giancotti on "how to perform certain work," Defts. 56.1 Stmt. ¶ 145, and in text messages Sciacca assigned Giancotti manual tasks like putting plastic around pipes, filling the worksite with concrete, and

arranging office tables, Kafedjian Decl., Exh. P2 at Giancotti000031-000032, 000043-000044, 000049; *see also* Giancotti Decl. ¶ 17.  A reasonable jury could find that, at both the Amsterdam and 14th Street Projects, Giancotti spent more time performing non-management activities, a fact which is undoubtedly "useful," and thus material, to the primary-duty analysis.  *See* 29 C.F.R. § 541.700(b).

While "[t]ime alone" is not dispositive, *id.*, the Court cannot conclude based on "factors other than time spent" that Giancotti's primary duty was nevertheless management.  *Sydney*, 751 F. App'x at 94-96 (examining other factors but finding there remained "genuine disputes of material facts regarding Plaintiffs' job duties" precluding any primary-duty conclusion as a matter of law).  Giancotti undisputedly engaged in certain management activities like "determining the types of materials, supplies, machinery, equipment or tools to be used," and "maintaining" employee "records for use in supervision or control."  29 C.F.R. § 541.102; *see, e.g.*, Defts. 56.1 Stmt. ¶¶ 162-163.  But record evidence places the "importance" of those duties "relative" to his non-management duties in dispute.  29 C.F.R. § 541.700(a).  Sciacca, for instance, explained that the work "Giancotti was in charge of" was "very limited" and "minor," and that Giancotti "had all the small jobs to do, like[] moving the offices or doing . . . little work [on] the windows, nothing major."  Sciacca Dep. Tr. at 38:13-41:15.  And as already mentioned, Campoccia allegedly told Giancotti that because he "could not read blueprints or work with computers," he "would need to work alongside the laborers and contribute *more manually*."  Giancotti Decl. ¶ 18.

Further muddying the waters is that Giancotti was allegedly directed by supervisors to engage in some of these management activities.  For example, he claims he was told by "Butta to take daily attendance reports for the laborers," Giancotti Decl. ¶ 21, by Campoccia to verify that subcontractors cleaned the worksite, Kafedjian Decl., Exh. AN at PZ010398, and by Sciacca to

instruct the laborers on what to do, Defts. 56.1 Stmt. ¶¶ 149, 164. Such tasks, Giancotti argues, show a lack of "discretion." Giancotti Decl. ¶¶ 21, 24-25. Defendants, for their part, argue that such a lack of discretion is irrelevant to the executive exemption. *See* Defts. SJ Reply at 9-11; *see also* Defts. SJ Br. at 19-20. The Court disagrees. To be sure, there is no discretion requirement expressly "written into the [main] executive exemption regulation," Defts. SJ Reply at 9, unlike in the main regulation governing the FLSA's administrative-employee exemption. *Compare* 29 C.F.R. § 541.100(a)(2) ("primary duty is management of the enterprise"), *with id.* § 541.200(a)(3) ("primary duty includes the exercise of discretion and independent judgment with respect to matters of significance"). But the regulations applicable to executive employees incorporate discretion in other ways. For instance, the primary-duty regulation considers "the employee's relative freedom from direct supervision." *Id.* § 541.700(a). Even more explicitly, the regulations teach that "exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management," while "the nonexempt employee generally is directed by a supervisor to perform the exempt work" of management. *Id.* § 541.106(a). So evidence that Giancotti was told to manage along with his non-exempt duties—rather than deciding to engage in non-exempt duties himself—is relevant to determining whether his primary duty was, in fact, management.

There are also genuine disputes on "the relationship between [Giancotti's] salary and the wages paid to other employees for the kind of nonexempt work" he performed. *Id.* § 541.700(a). The parties dispute whether—based on fact-intensive considerations like attendance, the need to use the Bobcat, and "normal issues that prevent Bobcat operations such as weather and holidays"— Giancotti made as much as an assistant superintendent as he would have made as a forklift operator, which is undoubtedly non-management work. *Compare* Defts. SJ Br. at 17, *with*

Giancotti Decl. ¶¶ 42-43.  And although there was no Bobcat forklift at the 14th Street Project, the Court does not find that any pay differential between Giancotti and that site's laborers establishes that Giancotti's primary duty was management as a matter of law.  In *Paganas*, for instance, the Second Circuit found "a genuine dispute as to whether [the plaintiff's] primary responsibilities were management activities" even though he "received compensation much greater than the cleaners he supervised," including where the plaintiff testified "that 90 percent of his work was non-supervisory physical [labor]."  726 F. App'x at 853-54.  The same is true here.

Finally, while "the factors enumerated in 29 C.F.R. § 541.700(a) are illustrative, not exhaustive," such that the Court should consider any relevant "additional information," *Sydney*, 751 F. App'x at 94, the Court does not find any undisputed facts that would establish that Giancotti primarily managed.  For instance, while Giancotti was told that he would no longer need to punch in and out like the other laborers, Defts. 56.1 Stmt. ¶ 78; Ho Decl., Exh. 15 at PZ004843, there is some evidence that his hours were monitored similarly to those of the laborers, *see, e.g.*, Giancotti Decl. ¶ 46; Kafedjian Decl., Exh. K at Giancotti000341-000342 (Giancotti's handwritten timesheets); Kafedjian Decl., Exh. Y at PZ018558 (Butta's email counting Giancotti's hours).  And although Giancotti was given certain benefits upon his promotion—like an email account, a phone reimbursement, and paid sick leave, Defts. 56.1 Stmt. ¶¶ 76-77, 126—Giancotti had health insurance even before his promotion, Giancotti Dep. Tr. at 77:20-78:16; Kafedjian Decl., Exh. L.

Ultimately, determining an employee's "primary duty must be based on all the facts in a particular case."  29 C.F.R. § 541.700(a); *id.* § 541.106(a).  Applying this highly fact-intensive inquiry, the Court cannot conclude that the undisputed material facts compel the conclusion that Giancotti's primary duty was management.

**b.  There Is No Material Dispute That Giancotti Customarily and Regularly Directed Other Employees**

An exempt executive "must customarily and regularly direct the work of two or more other employees."  *Id.* § 541.104(a); *accord id.* § 541.100(a)(3).  "Customarily and regularly" means "greater than occasional" but "less than constant," although it does not include "isolated or one-time tasks."  *Id.* § 541.701.  And as the Department of Labor regulations elaborate, an "employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence does not meet this requirement."  *Id.* § 541.104(c).

While the parties do not genuinely dispute that the number of other employees exceeded that required by the regulations, Defts. 56.1 Stmt. ¶¶ 20, 99, Giancotti purports to dispute whether he customarily and regularly directed their work, Pl. 56.1 Counter Stmt. ¶¶ 20, 99.  Yet it is undisputed that "[o]n an almost daily basis at the Amsterdam project, Plaintiff would be given instructions by [Muhammad] Riaz on what the [Pizzarotti] laborers should be doing for the day, and he would relay them to the employees."  Defts. 56.1 Stmt. ¶ 92.  (The same was true when Giancotti worked at the 14th Street Project, where he would relay Sciacca's daily instructions to the laborers.  *Id.* ¶¶ 149, 164.)  It is further undisputed that at "Riaz's request, Plaintiff would check on the [Pizzarotti] laborers to see whether they were doing their jobs."  *Id.* ¶ 96.  And it is undisputed that Giancotti was asked to "[v]erify that all subcontractors cleaned the job site."  Kafedjian Decl., Exh. AN at PZ010398; Defts. 56.1 Stmt. ¶ 172.

Although Giancotti asserts that he "did not have any supervisory authority over any of the other laborers at any time, whether they were direct [Pizzarotti] employees or subcontractors," Giancotti Decl. ¶ 23, the undisputed facts establish as a matter of law that he customarily and regularly directed multiple employees.  *Paganas*, once again, is instructive.  There, the Second Circuit found "no genuine issue of fact" on this factor, where the plaintiff's job as a building

35

manager "involved overseeing the cleaners' work, instructing cleaners to carry out work orders, and monitoring his buildings to make sure they were clean."  726 F. App'x at 853-54.  That was true even though the Second Circuit found "a genuine dispute" based on some of those same facts "as to whether [the plaintiff's] primary duty was management," especially when the time the plaintiff spent engaging in "non-supervisory physical cleaning" was disputed.  *Id.*  Here too, the Court concludes that Giancotti satisfies Section 541.100(a)(3)'s requirement of customarily and regularly directing the work of others.  Yet, with respect to the duties test, genuine disputes remain as to Giancotti's primary duty, 29 C.F.R. § 541.100(a)(2); *see supra* III.B.2.a, and, as explained below, as to the weight given to his suggestions and recommendations on the "change of status of other employees," 29 C.F.R. § 541.100(a)(4); *see infra* III.B.2.c.  *See Paganas*, 726 F. App'x at 853-55 (explaining that summary judgment was improper where there was "a genuine issue of fact" on the factors set forth in Section 541.100(a)(2) and (a)(4)).

### c.  Giancotti's Authority Over Other Employees' Status Is Disputed

Defendants concede that Giancotti "did not have ultimate authority without HR involvement to fire anyone."  Defts. SJ Br. at 21.  The question is thus whether Giancotti's "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [we]re given particular weight."  29 C.F.R. § 541.100(a)(4).  Under Department of Labor regulations, in determining "whether an employee's suggestions and recommendations are given 'particular weight,'" factors "to be considered" include "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."  *Id.* § 541.105.

While it is undisputed that Giancotti "was asked" on at least "a few occasions about

worker[s'] performance," Pl. 56.1 Counter Stmt. ¶ 156; Defts. 56.1 Stmt. ¶ 157, Defendants point

to no evidence indicating that his opinion was given "particular weight," 29 C.F.R.

§ 541.100(a)(4). Specifically, Defendants fail to present evidence indicating "the frequency with

which such suggestions and recommendations" were "requested." *Id.* § 541.105. Nor do they cite

any evidence establishing "the frequency with which" Giancotti's "suggestions and

recommendations [were] relied upon." *Id.* Indeed, even though Giancotti indisputably sent an

email purporting to "fire[] two labor masters" for being "irresponsible," Ho Decl., Exh. 18 at

PZ000890, Defendants do not claim to have heeded his advice, and Giancotti asserted that those

laborers in fact later came back to work, Giancotti Dep. Tr. at 182:2-186:4. Because the weight,

if any, given to Giancotti's recommendations as to the "change of status of other employees" is

unclear, 29 C.F.R. § 541.100(4), Defendants are not entitled to summary judgment on this facet of

Giancotti's duties. *See, e.g.*, *Jibowu v. Target Corp.*, 492 F. Supp. 3d 87, 113 (E.D.N.Y. 2020)

(finding "a disputed issue of material fact" where the evidence did "not conclusively establish that

Plaintiff's recommendations were given 'particular weight,' or even that Plaintiff was consistently

asked to give her recommendations").

At bottom, there are genuine disputes over two aspects of the duties test, even though a

genuine dispute as to only one would suffice to deny summary judgment. *See Helix Energy Sols.*

*Grp.*, 598 U.S. at 45-46, 58 (explaining that all three responsibilities must be met to satisfy the

duties test). Given "the numerous factual disputes in the record" that "preclude a finding that

Plaintiff['s] employment satisfied the 'duties' test as a matter of law," Defendants' motion for

summary judgment on Giancotti's FLSA and NYLL overtime claims in Claims Two and Three is

denied for this reason as well. *Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 528

(S.D.N.Y. 2013).

C.      **Claims Four and Five: NYLL Wage-Notice and Wage-Statement Provisions**

The NYLL requires employers, at the time of hiring, to provide employees with "a notice (1) describing the employee's rate of pay for regular and for overtime hours; (2) stating whether the employer intends to credit allowances for items such as tips, meals, and lodging toward the employee's minimum wage; (3) describing certain health care benefits; and (4) providing other basic information." *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 303 (2d Cir. 2024) (citing N.Y. Lab. Law § 195(1)(a)). That law also requires the employer to furnish a statement, each time wages are paid, "detailing the calculation of regular and overtime pay for that pay period, along with information on deductions and minimum wage allowances." *Id.* (citing N.Y. Lab. Law § 195(3)).

Defendants assert that Giancotti lacks Article III standing to make these wage-notice and wage-statement claims. Defts. SJ Br. at 23-24. "The requirements of Article III standing are well established: 'A Plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 141 (2d Cir. 2021) (citation modified) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). As the "party invoking federal jurisdiction," Giancotti "bears the burden of establishing these elements" with "the manner and degree of evidence required at the successive stages of the litigation"—meaning, for summary-judgment purposes, "specific facts" "set forth by affidavit or other evidence." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks and citation omitted).

As the Second Circuit recently explained, "to maintain a claim for statutory damages under New York Labor Law § 195," Giancotti must establish "a concrete injury-in-fact resulting from the failure to provide the wage notices and wage statements." *Guthrie*, 113 F.4th at 302-03. That

is because "bare procedural violations divorced from any concrete harm" do not suffice for Article III standing.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 440 (2021) (citation modified) (quoting *Spokeo*, 578 U.S. at 341).  Instead, where, as here, "a statutory violation amounts to a deprivation of information, a plaintiff 'must also allege downstream consequences from failing to receive the required information.'"  *Fortune v. Vivendi Ticketing US, LLC*, No. 24 Civ. 8415 (JPC), 2025 WL 2443681, at *5 (S.D.N.Y. Aug. 25, 2025) (quoting *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 (2d Cir. 2022)).

But that is not all:  a plaintiff must *also* "show some causal connection between the lack of accurate notices and the downstream harm."  *Guthrie*, 113 F.4th at 308.  That is, "unless the plaintiff-employee can show that he or she would have undertaken . . . advocacy and plausibly would have avoided some actual harm or obtained some actual benefit if accurate notices had been provided, the plaintiff-employee has not established a concrete injury-in-fact sufficient to confer standing to seek statutory damages under § 195."  *Id.*  So while a "plaintiff-employee *may* have suffered an injury-in-fact sufficient to establishing standing when, for example, inaccurate or noncompliant notices prevented the employee from obtaining full payment of wages in a timely fashion," he "cannot 'assume this conclusion without analysis' or rely on 'speculation and conjecture.'"  *Id.* at 309 (citation modified) (quoting *Quieju v. La Jugueria Inc.*, No. 23 Civ. 264 (BMC), 2023 WL 3073518, at *2 (E.D.N.Y. Apr. 25, 2023)).  "Rather, the plaintiff-employee must support a plausible 'theory as to *how* he was injured by the defendants' failure to provide the required documents.'"  *Id.*  (citation modified) (quoting *Quieju*, 2023 WL 3073518, at *2).

The Court finds that Giancotti fails to meet his burden at summary judgment to show a causal connection between the lack of a wage notice or a wage statement and any downstream harm.  In his opposition, Giancotti makes the conclusory assertion that the "failure to provide such

notices and wage statements caused [him] an injury in fact and delayed the full and timely payment of the wages he was entitled to, and corrections to his numerous incidents of short pay."  Pl. SJ Opp. at 28-29 (citing Pl. 56.1 Counter Stmt. ¶ 66).  And in his affidavit, all Giancotti asserts is that he "never received wage notices about [his] pay or what [he] was entitled to, which delayed [him] filing [his] labor complaints against Defendants," and that his wage statements "were often incorrect" such that he "was delayed in and impaired in seeking relief for [his] short pay." Giancotti Decl. ¶ 40.  Without more, Giancotti merely "reli[es] on speculation and conjecture" and fails to show that he "would have undertaken . . . advocacy and . . . avoided some actual harm or obtained some actual benefit if accurate notices had been provided."  *Guthrie*, 113 F.4th at 308-09 (internal quotation marks and citation omitted).

Giancotti therefore lacks a concrete injury-in-fact and, in turn, standing to bring his wage-statement and wage-notice claims.  *Id.* at 311.  Accordingly, Claims Four and Five are dismissed without prejudice for lack of standing.  *Katz v. Donna Karan Co.*, 872 F.3d 114, 121 (2d Cir. 2017) (explaining that "when a case is dismissed for lack of federal subject matter jurisdiction, Article III deprives federal courts of the power to dismiss the case with prejudice" (alteration adopted and internal quotation marks omitted)).

## D.    Claim Six: NYLL Timely-Payment Provision

Under the NYLL, manual workers "shall be paid weekly and not later than seven calendar days after the end of the week in which the wages are earned."  N.Y. Lab. Law § 191(1)(a)(i). Defendants claim that this provision "does not apply to persons such as [Giancotti] who are employed in a bona fide executive" capacity.  Defts. SJ Br. 24; *see also, e.g.*, *Pachter v. Bernard Hodes Grp., Inc.*, 891 N.E.2d 279, 282-83 (N.Y. 2008) (explaining that "employees serving in an executive, managerial or administrative capacity do not fall under section 191" as the NYLL

"eliminate[s] executives from particular requirements . . . such as the frequency of wage payments to manual workers, railroad workers, commission salespersons and clerical or other workers"). But as explained, the Court cannot conclude at summary judgment that Giancotti is a bona fide executive. *See supra* III.B. Defendants do not otherwise dispute that Giancotti is a manual worker entitled to weekly payments that he did not receive. *See* Defts. SJ Br. 24.

Instead, Defendants ask this Court to hold as a matter of law that Giancotti "does not have a private right of action to pursue alleged violations of [the] NYLL's pay frequency law." *Id.* This issue implicates a split among New York's intermediate appellate courts, whose decisions this Court would "generally [be] obliged to follow." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199-200 (2d Cir. 2005) (citation omitted). On the one hand, in *Vega v. CM & Associates Construction Management, LLC*, 107 N.Y.S.3d 286 (1st Dep't 2019), the First Department held "that Section 198 of the NYLL—based on its plain language and the intent of the legislature— both impliedly and expressly provides a private right of action where a manual worker is paid all his or her wages biweekly, rather than weekly as required under Section 191(1)(a)." *Clark v. CooperFriedman Elec. Supply Co.*, No. 23 Civ. 7806 (JPC), 2024 WL 3675944, at *2 (S.D.N.Y. Aug. 5, 2024). On the other, the Second Department held in *Grant v. Global Aircraft Dispatch*, 204 N.Y.S.3d 117 (2d Dep't 2024), "that Section 198 neither expressly nor impliedly provides a private [right] of action for manual workers paid biweekly in violation of Section 191(1)(a)." *Clark*, 2024 WL 3675944, at *2. Given this split, the Court must "predict" how "the New York Court of Appeals would rule" on the question. *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116-17 (2d Cir. 2000).

The Court agrees with "the reasoning of the many decisions" among its peers that *Vega*— finding a private right of action—"is a better indicator of how the Court of Appeals" would decide

41

the dispute.  *Toxqui v. R&P Pizza Corp.*, No. 24 Civ. 3339 (LJL), 2025 WL 2430569, at *12 (S.D.N.Y. Aug. 22, 2025) (collecting cases).  Begin with Section 198, the NYLL provision dealing with enforcement.  That provision contemplates that "an employee" may "institute[] in the courts" a "wage claim."  N.Y. Lab. Law § 198(1-a).  "Courts have therefore treated § 198(1-a) as providing an express cause of action for 'wage claims.'"  *Bryant v. Buffalo Exch., Ltd.*, No. 23 Civ. 8286 (AS), 2024 WL 3675948, at *4 (S.D.N.Y. Aug. 6, 2024) (citing *Vega*, 107 N.Y.S.3d at 287-88).  The question, then, is "what counts as a 'wage claim.'"  *Id.*  Section 198 provides a further hint: when an employee wins a wage claim

> the court shall allow such employee to recover the full amount of *any underpayment*, all reasonable attorney's fees, prejudgment interest as required under the civil practice law and rules, and, unless the employer proves a good faith basis to believe that *its underpayment of wages* was in compliance with the law, an additional amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due.

N.Y. Lab. Law § 198(1-a) (emphases added).  In other words, under Section 198, "wage claims involve underpayments," meaning that the ultimate question is "whether a late payment counts as an underpayment."  *Bryant*, 2024 WL 3675948, at *4.

At first glance, underpayment would arguably seem to mean "that an employee has received a lesser amount of earnings than agreed upon, not that the employee received the agreed-upon amount one week later, on the regular payday."  *Grant*, 204 N.Y.S.3d at 122.  But the statutory analysis runs deeper than glances.  Instead, the New York "Court of Appeals has adopted the principle that when statutory language is 'obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.'"  *Bryant*, 2024 WL 3675948, at *5 (quoting *CNH Diversified Opportunities Master Acct., L.P. v. Cleveland Unlimited, Inc.*, 160 N.E.3d 667, 673 (N.Y. 2020)).  That other legal source is Section 216 of the FLSA, which is "materially indistinguishable" from Section 198(1-a).  *Id.* at *4 (citing *Rana v. Islam*, 887 F.3d

118, 123 (2d Cir. 2018)).  And courts have long interpreted Section 216 as "allow[ing] an employee

to sue for late payments—rather than just unpaid amounts."  *Id.* (collecting cases).  Because "it is

clear that the New York State legislature" drafted Section 198(1-a) "to cover the same ground as

the FLSA," *Rana*, 887 F.3d at 123, that statute's "'old soil'—allowing employees to sue for late

payments alone . . . —comes too," *Bryant*, 2024 WL 3675948, at *5.  That is, "in light of the long-

settled construction of the FLSA, the NYLL affords a private right of action for claims of delayed

wage payments in violation of § 191."  *Espinal v. Sephora USA, Inc.*, No. 22 Civ. 3034 (PAE),

2024 WL 4241537, at *6 (S.D.N.Y. Sept. 19, 2024).

        Two other clues confirm this Court's conclusion that the New York Court of Appeals

would recognize a private right of action for late payments.  First, the New York Court of Appeals

explained in *dicta* that Section 198(1-a) covers "wage claims based upon violations of one or more

of the substantive provisions of [the] Labor Law," and then recognized Section 191 as one of those

substantive provisions.  *Konkur v. Utica Acad. of Sci. Charter Sch.*, 185 N.E.3d 483, 487 (N.Y.

2022) (citation omitted); *see Imhof v. New York City Hous. Auth.*, No. 23 Civ. 1880 (JPC), 2025

WL 2097844, at *8 (S.D.N.Y. July 25, 2025) ("Labeling a pronouncement by a higher court as

*dicta*, however, is hardly a license to 'cavalierly disregard it.'" (quoting *United States v. Hampton*,

676 F. Supp. 3d 283, 301 (S.D.N.Y. 2023)); *see also Bryant*, 2024 WL 3675948, at *5 (noting the

discussion in *Konkur*).  Second, on May 9, 2025, Section 198(1-a) was amended to clarify that

"liquidated damages shall not be applicable to violations of [N.Y. Lab. Law § 191(a)] where the

employer paid the employee wages on a regular payday, no less frequently than semi-monthly."

N.Y. Lab. Law § 198(1-a) (2025).  Instead,

        Such violations shall be subject to damages as follows: (i) no more than one
        hundred percent of the lost interest found to be due for the delayed payment of
        wages calculated using a daily interest rate for each day payment is late based on
        the annual rate of interest then in effect . . . for the employer's first violation; or (ii)

> for conduct occurring after [May 9, 2025], liquidated damages equal to one hundred percent of the total amount of wages found to be due in violation of [N.Y. Lab. Law § 191(a)] for any employer who, after [May 9, 2025], has been subject to one or more previous findings and orders for violations of [N.Y. Lab. Law § 191(a)] for which no proceeding for administrative or judicial review as provided in this chapter is pending and the time for initiation of such proceeding shall have expired and relating to employees performing the same work.

*Id.* As the amended provision contemplates there being "pending" "judicial review" for violations of Section 191 *before* its effective date, it "only buttresses the Court's conclusion" that the Court of Appeals would recognize an express private right of action for late-payment claims. *Gordon v. Riverdale SNF, LLC*, No. 24 Civ. 2612 (KPF), 2025 WL 2390727, at *12 (S.D.N.Y. Aug. 18, 2025).[10]  The Court thus rejects Defendants' invitation to adopt *Grant* and find no right of action.

Because there remains a factual dispute about whether Giancotti is exempt from Section 191's timely-payment provision, and because Defendants are not otherwise entitled to judgment as a matter of law, summary judgment is denied as to that claim.

## E.    Claim Seven: NYLL Wage-Deduction Provision

Under the NYLL, "[n]o employer shall make any deduction from the wages of an employee," subject to certain exceptions.  N.Y. Lab. Law § 193(1).  Deductions "made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency" are excepted, as are those "related to recovery of an overpayment of wages where such overpayment is due to a mathematical or other clerical error by the employer."  *Id.* § 193(1)(a), (c).  Deductions "expressly authorized in writing by the employee and . . . for the benefit of the employee" are also allowed.  *Id.* § 193(1)(b).

---

[10] "Having determined that Section 198(a-1) includes an express private right of action, the Court need not reach the *Vega* court's alternative holding that a private right of action is implied." *Toxqui*, 2025 WL 2430569, at *13 n.7.  Before trial, the Court will solicit the parties' position on what effect, if any, the 2025 amendment to Section 198(1-a) has on the amount of damages.

While the parties' submissions on this claim are less than clear, the thrust of Giancotti's claim seems to be that Defendants (1) wrongfully removed his hours, thus decreasing his pay; (2) docked his pay when he arrived late or left early; and (3) paid the contractually agreed-upon $100 for Saturdays worked only once, and indeed deducted certain Saturday payments. *See* Pl. SJ Opp. at 31. Defendants, for their part, claim "the record supports that *correction* of Plaintiff's entries was what occurred since he often misused or completely ignored the Company's time entry systems . . . for his copious [paid time off] and vacation," such that "there would be no wages due since Plaintiff did not actually work that time." Defts. SJ Reply at 14. In doing so, Defendants apparently argue that "wages" under Section 193 include only payments for time actually worked, and not salary. *See id.* (citing N.Y. Lab. Law § 190(1) (defining "wages")). As for any Saturday pay, Defendants assert that Giancotti's "contemplated salary already included . . . it." *Id.*

The Court denies summary judgment on Giancotti's unlawful-deductions claim. The wages that should not ordinarily be deducted under Section 193 are defined as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." N.Y. Lab. Law § 190(1). Contrary to Defendants' suggestion, a salary counts as earnings for labor or services rendered. *See Ryan v. Kellogg Partners Institutional Servs.*, 968 N.E.2d 947, 956 (N.Y. 2012) (explaining that a wage is one that is "earned," in that "its payment [is] guaranteed and non-discretionary as a term and condition of [one's] employment"). Indeed, New York courts have recognized that an employee "state[s] a cause of action to recover damages for violations of Labor Law § 193 based on the allegations that the [employer] failed to pay a portion of his salary." *Costello v. Curan & Ahlers, LLP*, 206 N.Y.S.3d 93, 96 (2d Dep't 2024). Defendants cite no case for the proposition that a

salaried employee's wages may be lawfully deducted based on the hours they do not work.[11]

Rather, the case they do cite, *see* Defts. SJ Reply at 14, stands only for the proposition that the

plaintiff's particular stock options were "not wages" such that their deprivation was not an

unlawful deduction. *Diaz-Roa v. Hermes Law, P.C.*, 757 F. Supp. 3d 498, 569-71 (S.D.N.Y.

2024). Defendants' position that these were not wages thus fails.

With that legal objection out of the way, Defendants do not appear to dispute that they

deducted Giancotti's wages and instead argue only that any deductions were not unlawful. But

they point to no "provisions of any law" under which those deductions were permissibly made.

N.Y. Lab. Law § 193(1)(a). Nor is the record clear that the deductions were to recover

"overpayment[s]" caused by Defendants' "mathematical or other clerical error." *Id.* § 193(1)(c).

After all, there were at least "two or three occasions" when the company underpaid Giancotti on

the concededly mistaken assumption that he had taken non-paid days off. Lee Dep. Tr. at 50:12-

53:16, 63:13-64:9; Kafedjian Decl., Exh. Y at PZ018558. And Defendants seem to misunderstand

the statute: *deductions*—not payments—may be "expressly authorized in writing by the employee"

if for the employee's "benefit." N.Y. Lab Law § 193(1)(b). Such authorized deductions include,

for example, "insurance premiums," pension benefits, union dues, and such. *Id.* So if, as Giancotti

says, he was "entitled to a bonus of $100 for each Saturday worked," and Defendants either failed

to pay or "later deducted" such payments, Giancotti Decl. ¶ 41, then whether those payments were

contemplated in his salary is irrelevant to whether such deductions were expressly authorized.[12]

---

[11] The Court observes that this argument chafes against Defendants' position that Giancotti was in fact paid on a salary basis for purposes of the executive exemption. *See supra* III.B.1.

[12] Failure to pay any Saturday bonuses would count as a deduction because in 2021, "the state legislature amended Section 193 to make clear that 'there is no exception to liability under this section for the unauthorized failure to pay wages, benefits or wage supplements.'" *Smith v. Lyle*, No. 24 Civ. 2767 (JPC), 2025 WL 1684790, at *13-14 (S.D.N.Y. June 16, 2025) (citation modified) (quoting N.Y. Lab. Law § 193(5) (2021)).

And Defendants point to no evidence suggesting that they were. There thus remain genuine issues of fact as to whether Giancotti's deductions were lawful.

## F.    Claims Eight and Nine: FLSA and NYLL Retaliation

Both the FLSA and the NYLL prohibit "retaliation against employees who orally complain to their employers, so long as their complaint is 'sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection.'" *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 117 (2d Cir. 2015) (quoting *Kasten v. Saint-Gobain Performance Plastics Corp.,* 563 U.S. 1, 14 (2011)); *see* 29 U.S.C. § 215(a)(3); N.Y. Lab. Law § 215(1)(a).   Under a "three-step burden-shifting framework, a plaintiff alleging retaliation under the FLSA and NYLL 'must first establish a *prima facie* case of retaliation by showing (1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" *Williams v. Harry's Nurses Registry, Inc.*, No. 24-34-cv, 2025 WL 842041, at *3 (2d Cir. Mar. 18, 2025) (summary order) (quoting *Mullins*, 626 F.3d at 53).  "If the plaintiff establishes a *prima facie* case, 'the burden shifts to the defendant[] to articulate a legitimate, non-retaliatory reason for the employment action.'" *Id.* (citation modified).  If the defendant, in turn, meets that burden, "the plaintiff must produce sufficient evidence to support a rational finding that the legitimate, non-retaliatory reasons proffered by the defendant were false, and that more likely than not retaliation was the real reason for the employment action." *Id.* (citation modified).

As for Giancotti's *prima facie* case, Defendants do not dispute that in suspending and then firing him, he suffered an adverse employment action, nor could they. *See, e.g.*, *Witek v. City of New York*, 807 F. App'x 52, 54 (2d Cir. 2020) (summary order) (observing that "[the plaintiff's]

suspension and termination certainly constitute 'adverse employment actions'"). Instead, they argue that Giancotti can establish neither a protected activity nor a causal connection between any protected activity and his suspension and firing. *See* Defts. SJ Br. at 25-27; Defts. SJ Reply at 14-15. The Court disagrees. A reasonable juror could find that Giancotti's complaint was protected activity: indeed, on April 6, 2023, Giancotti expressed his "concerns" that he was misclassified as an exempt employee under the FLSA, was not timely paid under the NYLL, and had his paycheck wrongly deducted based on his hours worked. Kafedjian Decl., Exh. AB at Giancotti000343-000345. An employee "engage[s] in protected activity when he ask[s] the [employer] . . . about his status as exempt from overtime pay." *Wilson v. N.Y. & Presbyterian Hosp.*, No. 21-1971-cv, 2022 WL 17587564, at *1 (2d Cir. Dec. 13, 2022) (summary order). A reasonable juror could also find a causal connection between that protected activity and Giancotti's suspension and firing: "Causation in a retaliation claim can be shown either directly or through circumstantial evidence, usually when the adverse action followed soon after the protected activity." *Id.* at *2 (citing *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d. Cir. 2013)). Here, Giancotti provides evidence of both. *The same day* Giancotti expressed his concerns, Campoccia told him that he was "no longer allowed" on the 14th Street Project "or any other [of] Pizzarotti's projects" "[c]onsidering all [his] latest ongoing allegations against the company." Kafedjian Decl., Exh. AA at Giancotti000353. And on April 19, 2023—less than two weeks later—he was terminated "considering [his] allegations." Kafedjian Decl., Exh. N at Giancotti000158-000161. As the Second Circuit has held, a "three-week period from [the employee's] complaint to her termination is sufficiently short to make a *prima facie* showing of causation indirectly through temporal proximity." *Zann Kwan*, 737 F.3d at 845. So Giancotti has established a *prima facie* case for his retaliation claims. *Id.*

Defendants, in turn, gesture at a legitimate, non-retaliatory reason for Giancotti's termination—although not for his same-day suspension.    According to Defendants, "approximately one month before his employment was terminated, Mr. Campoccia told [Giancotti] that the 14th Street project would be ending, that [Pizzarotti] would be cutting staff, and that Plaintiff should look for another job."  Defts. SJ Reply at 15.  There is some evidence in the record backing up the claim that the 14th Street Project was winding down, that laborers on the project had been let go for that reason, and that Giancotti's continued status on the jobsite was similarly in question.  Defts. 56.1 Stmt. ¶¶ 181-182; Butta Dep. Tr. at 160:5-10.  However, whether Giancotti would be let go or simply transferred to another Pizzarotti project in Italy is disputed.  Kafedjian Decl., Exh. AO.  The Court assumes for the purposes of this motion that Defendants' proffered reason suffices to shift the burden back to Giancotti.

Even assuming that this lack of work was a legitimate, non-retaliatory reason for Defendants' actions, "a reasonable juror could conclude that the explanations were a pretext for a prohibited reason" based on "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered" reason.  *Zann Kwan*, 737 F.3d at 846.  To begin, there are inconsistencies and contradictions in Defendants' explanations.  Butta, for his part, explained that Giancotti was let go because there was no more "need of a person" like Giancotti "on the work site," as work at the "14th Street Project was by [then] 90 percent done."  Butta Dep. Tr. at 160:5-10.  But the termination letter Giancotti received on April 19, 2023, made no mention of that project's winding down; to the contrary, it cited Giancotti's "issues" relating to his "attitude towards hours worked and vacation time," his "poor" "performance and commitment," and—notably—his "allegations" against the company.  Kafedjian Decl., Exh. N at Giancotti000158-000161.  Such "discrepancies" combined with "the temporal proximity between the complaint and the termination" would suffice

for a "reasonable juror [to] infer that the explanation given by [Defendants] was pretextual." *Zann Kwan*, 737 F.3d at 847. Considering the direct evidence from Campoccia's suspension email and the termination letter, Giancotti easily clears the bar to survive summary judgment on his retaliation claims.

Ultimately, "[v]iewing the evidence in the light most favorable to [Giancotti], as required on a motion for summary judgment, there is sufficient evidence to require denial of the summary judgment motion on the claims for retaliation." *Zann Kwan*, 737 F.3d at 847.

## IV.  Conclusion

For these reasons, summary judgment is granted with respect to Claims Four and Five, and those claims are dismissed without prejudice. Summary judgment is denied with respect to all the other claims. The Court will hold an in-person status conference on October 1, 2025, at 2:00 p.m., in Courtroom 12D of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007. The parties should be prepared to discuss a trial date and related trial logistics.

The Clerk of Court is respectfully directed to close Docket Number 46.

SO ORDERED.

Dated: September 9, 2025
     New York, New York
                                  JOHN P. CRONAN
                           United States District Judge